**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JOHN WITT, derivatively on behalf of DIGITAL TURBINE, INC., | |
| Plaintiff, | Case No.: |
| v. | |
| WILLIAM STONE, BARRETT GARRISON, ROBERT DEUTSCHMAN, ROY H. CHESTNUTT, JEFFREY KARISH, HOLLY HESS GROOS, MOHAN S. GYANI, and MICHELLE STERLING, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| DIGITAL TURBINE, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

**INTRODUCTION**

Plaintiff John Witt ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Digital Turbine, Inc. ("Digital Turbine" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants William Stone, Barrett Garrison, Robert Deutschman, Roy H. Chestnutt, Jeffrey Karish, Holly Hess Groos, Mohan S. Gyani, and Michelle Sterling (collectively, the "Individual Defendants" and with Digital Turbine, "Defendants") for breaches of their fiduciary duties as directors, and/or officers of Digital Turbine and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information

1

and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Digital Turbine, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This shareholder derivative action seeks to remedy wrongdoing committed by Digital Turbine's officers and directors between February 26, 2021 and May 31, 2022, both dates inclusive (the "Relevant Period").

2.     Digital Turbine is a Texas-based Delaware corporation that promotes the independent growth and monetization of mobile device advertising. The Company works with a variety of players including advertisers, publishers, carriers, and original equipment manufacturers ("OEMs") to maximize advertising capabilities and profits. The Company boasts a robust network of 980 employees, spanning 31 cities across 23 countries.

3.     On April 29, 2021, Digital Turbine acquired AdColony Holding AS ("AdColony"). Approximately one month later, on May 25, 2021, the Company acquired another entity, Fyber N.V. ("Fyber").

4.     Almost immediately, the Company publicly forecasted the benefits of acquiring AdColony and Fyber. For instance, on April 29, 2021, in a press release, Defendant William Stone ("Stone") said "[Digital Turbine] believe[s] that this strategic transaction [acquiring AdColony], along with the previously completed acquisition of Appreciate and pending completion of the

Fyber acquisition, will synergistically accelerate our growth and is a real positive for our partners, advertisers, employees and shareholders."

5.      The next month, Defendant Stone continued this refrain, stating, "[Digital Turbine] [is] certainly excited about the anticipated revenue synergies that Fyber, AdColony and Appreciate will engender for the combined company, our partners, and our customers."

6.      At first, Digital Turbine reported product line revenues from AdColony and Fyber on a gross basis. Multiple quarterly reports, filed with the SEC on Form 10-Q, stated that the Company's "disclosure controls and procedures were effective."

7.      Despite these representations, on May 17, 2022, Digital Turbine issued a press release revealing that it would need to "restate its financial statements for the interim periods ended June 30, 2021, September 30, 2021, and December 31, 2021, following a review of the presentation of revenue net of license fees and revenue share for the Company's recently acquired businesses."

8.      The press release announced a change of course for classifying AdColony and Fyber product lines and other newly obtained companies, stating that these product line revenues would be reported net of license fees and revenue share instead of on a gross basis, as previously done. Digital Turbine suggested this difference in reporting would lower revenue, license fees, and revenue share.

9.      Additionally, on the same day, May 17, 2022, Digital Turbine filed a current report on Form 8-K with the SEC conceding that "the Company's disclosure controls and procedures were not effective as of June 30, 2021, September 30, 2021, and December 31, 2021."

10.      The market received this news negatively, and the price per share of the Company's common stock dropped from $27.21 at close on May 17, 2022, to close on May 18, 2022 at $25.28 per share. This $1.93 decline marked approximately a 7.1% one-day decrease in value.

11.     Shortly thereafter, the Company revealed its fourth quarter 2022 and fiscal year ended March 31, 2022 results in a May 31, 2022 press release. The release featured a flimsy revenue forecast and earnings per share figures that fell under market expectations.

12.     On this news, the price per share of the Company's common stock dropped $5.75, from closing at $25.43 on May 31, 2022, to close at $19.68 per share on June 1, 2022.

13.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. In particular, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (i) AdColony and Fyber act as agents in certain of their product lines; (ii) resultingly, Digital Turbine was required to report revenues achieved by these acquisitions net of license fees rather than on a gross basis; (iii) the Company's internal controls over financial reporting, and revenue recognition in particular, were ineffective; (iv) Digital Turbine did not perform proper due diligence into AdColony and Fyber; (v) consequently, it was extremely difficult to properly report revenue stemming from the AdColony and Fyber acquisitions; (vi) in view of the foregoing, the Company's net revenues were overstated during the 2022 fiscal year; and (vii) the Company failed to maintain internal controls. As a result of the foregoing, Digital Turbine's public statements about its business and financial stature were materially false and misleading at all relevant times.

14.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls. Moreover, certain of the Individual

Defendants engaged in lucrative insider sales while Digital Turbine's stock was artificially inflated during the Relevant Period.

15.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO") to being named as defendants in two securities fraud class action lawsuits in the United States District Court for the Western District of Texas (the "Class Actions"). The Company has further been subjected to the need to undertake internal investigations, and to implement adequate internal controls. As a result, Digital Turbine will have to expend many millions of dollars.

16.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of certain directors' and officers' liability in the Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Class Actions based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. In addition, the Company's principal executive offices are located in this District.

## THE PARTIES

### Plaintiff

22.     Plaintiff is a current Digital Turbine stockholder who has continuously held Digital Turbine common stock at all relevant times.

### Defendant Stone

23.     Defendant Stone is Digital Turbine's CEO and has been since October 2014. Defendant Stone is also a Company director and has been since January 2015. Before his current roles, Defendant Stone served as the Company's President and Chief Operating Officer dating to November 2013.

24.     As of July 7, 2022, Defendant Stone owned 2,047,449 shares of the Company's common stock, constituting 2.4% of the Company's outstanding common stock. At the close of trading on July 7, 2022, Digital Turbine's stock price was $18.07 per share. Thus, Defendant Stone owned approximately $42.8 million worth of Digital Turbine stock.

25.     Defendant Stone's compensation for the 2021 fiscal year ended March 31, 2021 ("FY 2021") was $2,297,870, including $500,000 in stock awards. His compensation for the 2022

fiscal year ended March 31, 2022 ("FY 2022") was $7,748,317, including $4,875,000 in stock awards.

26.     During the Relevant Period when the Company disseminated false and misleading information that artificially inflated the Company's stock price, Defendant Stone sold Digital Turbine stock at artificially inflated rates. Specifically, on March 2, 2022, Defendant Stone sold 70,271 shares at an average price per share of $46.45, netting proceeds of $3,264,087. Defendant Stone's insider sales were made when he was privy to material nonpublic information, thereby demonstrating Defendant Stone's motive and complicity in the present unlawful scheme.

**Defendant Garrison**

27.     Defendant Barrett Garrison ("Garrison") is Digital Turbine's CFO and Executive Vice President and has been since September 2016.

28.     As of July 7, 2022, Defendant Garrison owned 1,171,733 shares of the Company's common stock, constituting 1.2% of the Company's outstanding common stock. At the close of trading on July 7, 2022, Digital Turbine's stock price was $18.07 per share. Thus, Defendant Garrison owned approximately $21.2 million worth of Digital Turbine stock.

29.     Defendant Garrison's compensation for FY 2021 was $1,081,091, including $200,000 in stock awards. His compensation for FY 2022 was $2,696,562, including $1,500,000 in stock awards.

**Defendant Deutschman**

30.     Defendant Robert Deutschman ("Deutschman") is and has been a director of Digital Turbine since May 2013. Defendant Deutschman has also served as the Chairman of the Board since December 2014. Defendant Deutschman also serves as a member of the Audit Committee and Governance and Nominating Committee.

31.     As of July 7, 2022, Defendant Deutschman owned 588,812 shares of the Company's common stock. At the close of trading on July 7, 2022, Digital Turbine's stock price was $18.07 per share. Thus, Defendant Deutschman owned approximately $10.6 million worth of Digital Turbine stock.

32.     Defendant Deutschman's compensation for FY 2021 was $234,500, including $147,250 in stock awards. His compensation for FY 2022 was $372,000, including $287,250 in stock awards.

**Defendant Chestnutt**

33.     Defendant Roy H. Chestnutt ("Chestnutt") is and has been a director of Digital Turbine since June 2018. Defendant Chestnutt serves as a member of the Audit Committee.

34.     As of July 7, 2022, Defendant Chestnutt owned 108,541 shares of the Company's common stock. At the close of trading on July 7, 2022, Digital Turbine's stock price was $18.07 per share. Thus, Defendant Chestnut owned approximately $1.9 million worth of Digital Turbine stock.

35.     Defendant Chestnutt's compensation for FY 2021 was $150,000, including $95,000 in stock awards. His compensation for FY 2022 was $245,000, including $190,000 in stock awards.

**Defendant Karish**

36.     Defendant Jeffrey Karish ("Karish") is and has been a director of Digital Turbine since May 2013. Defendant Karish also serves as the chair of the Compensation Committee.

37.     As of July 7, 2022, Defendant Karish owned 311,616 shares of the Company's common stock. At the close of trading on July 7, 2022, Digital Turbine's stock price was $18.07

per share. Thus, Defendant Karish owned approximately $5.6 million worth of Digital Turbine stock.

38.     Defendant Karish's compensation for FY 2021 was $151,500, including $95,750 in stock awards. His compensation for FY 2022 was $247,750, including $192,000 in stock awards.

**Defendant Groos**

39.     Defendant Holly Hess Groos ("Groos") has served as a Digital Turbine director since May 2021. Defendant Groos also serves as the chair of the Compensation Committee. Defendant Groos' compensation for FY 2022 was $255,502, including $213,813 in stock awards.

**Defendant Gyani**

40.     Defendant Mohan S. Gyani ("Gyani") is and has been a director of Digital Turbine since January 2016. Defendant Gyani also serves as the chair of the Governance and Nominating Committee and as a member of the Compensation Committee.

41.     As of July 7, 2022, Defendant Gyani owned 451,949 shares of the Company's common stock. At the close of trading on July 7, 2022, Digital Turbine's stock price was $18.07 per share. Thus, Defendant Gyani owned approximately $8.2 million worth of Digital Turbine stock.

42.     Defendant Gyani's compensation for FY 2021 was $154,750, including $97,375 in stock awards. His compensation for FY 2022 was $249,875, including $192,500 in stock awards.

**Defendant Sterling**

43.     Defendant Michelle Sterling ("Sterling") is and has been a director of Digital Turbine since June 2019. Defendant Sterling also serves as a member of the Governance and Nominating Committee and as a member of the Compensation Committee.

44.     As of July 7, 2022, Defendant Sterling owned 37,519 shares of the Company's common stock. At the close of trading on July 7, 2022, Digital Turbine's stock price was $18.07 per share. Thus, Defendant Sterling owned approximately $678,000 worth of Digital Turbine stock.

45.     Defendant Sterling's compensation for FY 2021 was $145,750, including $92,875 in stock awards. His compensation for FY 2022 was $243,125, including $190,250 in stock awards.

**Nominal Defendant Digital Turbine**

46.     Digital Turbine is a Delaware corporation with its principal executive offices at 110 San Antonio Street, Suite 160, Austin, Texas 78701. Digital Turbine's shares trade on the NASDAQ Capital Market ("NASDAQ") under the ticker "APPS."

## MISCONDUCT OF THE INDIVIDUAL DEFENDANTS

### Company Overview

47.     Digital Turbine is a software company that works with businesses to facilitate advertising services across mobile device platforms. By working with advertisers, publishers, carriers, and OEMs, Digital Turbine monetizes mobile content. The Company has an expansive reach in the robust technology industry by specializing in mobile content, mobile applications, mobile games, application management solutions, device management, on-device portals, mobile payment, mobile commerce, music streaming, and eBooks, among other things.

48.     On April 29, 2021, Digital Turbine acquired AdColony, a Norwegian company that specialized in mobile advertising. AdColony possessed proprietary video technology that resulted in highly viewed advertisements for large companies such as Amazon and Disney.

49.      Approximately one month later, on May 25, 2021, Digital Turbine acquired Fyber, a company that traded on the Frankfurt Stock Exchange. Fyber specialized in mobile advertising as well and offered an international network of 650 million monthly active users and proprietary technology with significant experience in mediation and real-time bidding for advertising.

### False and Misleading Statements Made During the Relevant Period

### February 26, 2021 Press Release

50.      On February 26, 2021, the Company issued a press release announcing the purchase of AdColony, in relevant part:

> Digital Turbine, Inc. (Nasdaq: APPS) announced today that it has entered into a definitive purchase agreement to acquire AdColony Holding AS ("AdColony") from Otello Corporation ASA ("Otello"), a Norway company and sole shareholder of AdColony. AdColony is a leading mobile advertising platform servicing advertisers and publishers with a reach of more than 1.5 billion monthly global users. The Company's proprietary video technologies and rich media formats are widely viewed as best-in-class technology delivering industry-leading third-party verified viewability rates for well-known global brands, such as Disney, Amazon and BMW.
>
> The acquisition of AdColony is fully consistent with Digital Turbine's expressed strategy to provide a comprehensive media and advertising solution for our operator and OEM partners while enriching the mobile experience for end users by delivering highly relevant content to their fingertips. The acquisition is subject to approval of the Otello shareholders and is expected to close in the Company's fiscal fourth quarter.

51.      Defendant Stone stated that the acquisition of AdColony would be "substantially accretive" to the Company's business prospects:

> "We are extremely excited to announce the acquisition of AdColony today," said Bill Stone, CEO of Digital Turbine. "We look forward to welcoming the AdColony team to the Digital Turbine family and believe that this strategic transaction will accelerate our growth and is a positive for our partners, advertisers, employees and shareholders. AdColony saw the secular tailwinds toward mobile, video and high-speed networks like 5G before most and has been able to capitalize on its vision. The ability for Digital Turbine to utilize AdColony's unique mobile advertising solutions across our vast device distribution footprint will unlock significant new monetization opportunities for the combined company's platform offerings. With the addition of AdColony, we will expand our collective experience, reach and suite

of capabilities to benefit mobile advertisers and publishers around the globe. Performance-based spending trends by large, established brand advertisers present material upside opportunities for platforms with unique technology deployable across exclusive access to inventory."

Mr. Stone concluded, "We look forward to providing more specific details regarding our forward financial projections for AdColony after the transaction has closed. **Considering the current run-rate of recurring business at AdColony, along with expected realized synergies and the terms of consideration, we anticipate that the AdColony transaction will be substantially accretive to our expected profitability in the first full year following the transaction.**"

(Emphasis added.)

**March 22, 2021 Press Release**

52.     Approximately one month after the announcement of the AdColony acquisition,

Digital Turbine issued a press release announcing the acquisition of Fyber on March 22, 2021,

which stated, in relevant part:

Digital Turbine, Inc. (Nasdaq: APPS) announced today that it has entered into a definitive purchase agreement to acquire approximately 95% of the shares in Fyber N.V. (Frankfurt Stock Exchange: FBEN, "Fyber"), a leading mobile advertising monetization platform empowering global app developers to optimize profitability through quality advertising. With its proven expertise in mediation and real-time bidding, Fyber has amassed an extensive network with more than 180 programmatic demand partners that reach a total of 650 million unique monthly active users across more than 180 different countries globally. The Company's proprietary technology platform and expertise in mediation, real-time bidding, advanced analytics tools, and video combine to deliver publishers and advertisers a uniquely holistic app monetization solution.

The acquisition of Fyber is part of Digital Turbine's expressed strategy to provide comprehensive media and advertising solutions for our partners and advertisers while enriching the mobile experience for end users through native on-device discovery. **By combining Fyber's rapidly growing mediation, exchange and advertising solutions with Digital Turbine's core native application and content discovery experiences, the combined company should be ideally positioned to be a leading end-to-end solution for mobile brand acquisition and monetization.**

(Emphasis added.)

53.     As he did approximately one month earlier, Defendant Stone publicly flaunted the

acquisition as a big win for Digital Turbine, especially for revenue purposes:

> "We are very excited to welcome Fyber to the Digital Turbine team," said Digital
> Turbine CEO, Bill Stone. "Combined with our recently announced AdColony and
> Appreciate acquisitions, Fyber represents an extremely valuable puzzle piece for
> Digital Turbine to strategically assemble one of the largest full-stack mobile
> advertising solutions in the industry that will be advantageously positioned to
> leverage the Company's vast device distribution footprint and array of innovative
> products, such as Single-Tap. We believe that we will have all of the critical
> elements of a truly unique next-generation ad-tech ecosystem that, once integrated,
> will enable Digital Turbine to play a far more prominent and profitable role in the
> fast-growing and securely-thriving $200+ billion mobile advertising and
> connected TV marketplace."
>
> Mr. Stone concluded, "The Fyber team has done an amazing job architecting and
> building a highly differentiated and robustly scalable standalone business. Their
> strong recent growth and profitability is a testament to the quality of the Fyber team
> and the premium value that the company innovatively delivers to its platform
> constituents. **We are certainly excited about the anticipated revenue synergies
> that Fyber, AdColony and Appreciate will engender for the combined
> company, our partners, and our customers."**

(Emphasis added.)

**April 29, 2021 Press Release**

54.     On April 29, 2021, Digital Turbine issued another press release, this time

announcing the closure of the AdColony acquisition and its impact on the Company:

> We are excited to have formally closed the acquisition of AdColony," said Bill
> Stone, CEO of Digital Turbine. "We believe that this strategic transaction, along
> with the previously completed acquisition of Appreciate and pending completion
> of the Fyber acquisition, will synergistically accelerate our growth and is a real
> positive for our partners, advertisers, employees and shareholders. With the
> addition of AdColony, we will expand our collective experience, reach and suite of
> capabilities to benefit mobile advertisers and publishers around the globe.
> Performance-based spending trends by large, established brand advertisers present
> material upside opportunities for platforms with unique technology deployable
> across exclusive access to inventory.

**May 25, 2021 Press Release**

55.     Similarly, on May 25, 2021, Digital Turbine announced the closure of the Fyber acquisition and its impact on the Company:

> We are excited to formally welcome Fyber to the Digital Turbine team today," said Digital Turbine CEO, Bill Stone. "Combined with our recently completed AdColony and Appreciate acquisitions, Fyber represents a very important puzzle piece for Digital Turbine in its mission to develop one of the largest full-stack, fully-independent, mobile advertising solutions in the industry. The combined platform offering is already generating more than $1 billion in annualized revenue and is advantageously positioned going forward to leverage the Company's existing on-device software presence and vast global distribution footprint. We believe that we now have all of the critical elements to fully establish Digital Turbine as a truly unique next-generation ad-tech ecosystem that will enable the Company to play a far more prominent and profitable role in the fast-growing and secularly-thriving $200+ billion mobile advertising and connected TV marketplace."
>
> Mr. Stone concluded, "As evidenced by the reported 179% year-over-year revenue growth in the March quarter, the Fyber team has done an amazing job of building a highly differentiated, growing and profitable standalone business. Their rapid growth and expanding profitability, as demonstrated most recently with their strong March quarter results, is a testament to the quality of the Fyber team and the premium value that the company innovatively delivers to its platform constituents. We are certainly excited about the anticipated revenue synergies that Fyber, AdColony and Appreciate will engender for the combined company, our partners, and our customers. We look forward to providing additional color and forward-looking commentary on our upcoming earnings call.

**July 29, 2021 Proxy Statement**

56.     On July 29, 2021, Digital Turbine filed a Schedule 14A with the SEC ("2021 Proxy"). Defendants Stone, Deutschman, Chestnutt, Karish, Groos, Gyani, and Sterling solicited the 2021 Proxy, which was filed pursuant to Section 14(a) of the Exchange Act. The 2021 Proxy contained material misstatements and omissions.

57.     The 2021 Proxy asked Digital Turbine stockholders to vote to, *inter alia*: (1) reelect Defendants Stone, Deutschman, Chestnutt, Karish, Groos, Gyani, and Sterling to the Board; (2) approve, via non-binding advisory vote, the compensation of Digital Turbine's named executive officers, including Defendants Stone and Garrison; and (3) ratify the appointment of Grant

Thornton LLP as Digital Turbine's independent registered public accounting firm for the fiscal year ending March 31, 2022.

58.     The 2021 Proxy stated the following about Digital Turbine's Code of Conduct and who it applies to:

> The Board has established a corporate Code of Conduct which qualifies as a "code of ethics" as defined by Item 406 of Regulation S-K of the Securities Exchange Act of 1934 and applies to the Company's principal executive officer, principal financial officer, principal accounting officer and all other officers, directors, and employees.

59.     The 2021 Proxy also provided that "[i]f we . . . grant a waiver from any provision of the Code of Conduct to any such person, we shall disclose such amendment or waiver on our website . . . ."

60.     Under the heading "Role of the Board of Directors in Risk Oversight," the 2021 Proxy addressed the Board's responsibilities:

> One of the responsibilities of our Board is to review and evaluate the process used to assess major risks facing our Company and to periodically review assessments prepared by our senior management of such risks, as well as options for their mitigation. Frequent interaction between our directors and members of senior management assist in this effort. Communications between our Board and senior management regarding long-term strategic planning and short-term operational practices include matters of material risk inherent in our business.

> Our Board also plays an active role, as a whole and at the committee level, in overseeing management of our risks. Our entire Board is apprised during each fiscal year of our enterprise risk management efforts. Our Board regularly reviews information regarding our credit, liquidity and operations, as well as the risks associated with each. Our Audit Committee is responsible for overseeing the management of financial and accounting risks. Our Compensation Committee is responsible for overseeing the management of risk-taking relating to executive compensation plans and arrangements. While each committee is responsible for the evaluation and management of such risks, our entire Board is regularly informed through committee reports.

61.     The 2021 Proxy stated the following pertaining to the performance-based portion of named executive officer compensation and its relationship to revenue levels:

> ***Performance Bonuses***.   Consistent with our emphasis on pay-for-performance incentive compensation programs, our executives are eligible to receive cash incentive bonuses primarily based upon their performance during the fiscal year. Historically, for our CEO and CFO, factors given considerable weight in establishing bonus performance criteria are revenues and non-GAAP adjusted EBITDA, which is GAAP net earnings or loss excluding various cash and non-cash expenses, including: interest expense, foreign transaction gains (losses), debt financing and non-cash related expenses, debt discount and non-cash debt settlement expense, gain or loss on extinguishment of debt, income taxes, asset impairment charges, depreciation and amortization, stock-based compensation expense, change in fair value of derivatives, and fees and expenses related to acquisitions. Our Compensation Committee utilizes the adjusted EBITDA amounts publicly-reported by the Company.

> \*               \*               \*

> ***Equity and Equity-Based Compensation.***   We believe that equity or equity-based compensation are an important long-term incentive for our executive officers and other employees and generally align officer and employee interest with that of our stockholders. They are intended to further our emphasis on pay-for-performance.

62.     The 2021 Proxy was materially misleading because it neglected to disclose that: (i) though Digital Turbine claimed its officers and directors adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; (ii) contrary to the 2021 Proxy's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting Digital Turbine to issue false and misleading statements about itself; and (iii) the Individual Defendants used "pay-for-performance" rewards when calculating executive compensation despite artificially inflating the Company's value by issuing false and misleading statements.

63.     The 2021 Proxy was further materially misleading because it failed to disclose, *inter alia*: (i) AdColony and Fyber act as agents in certain of their product lines; (ii) resultingly, Digital Turbine was required to report revenues achieved by these acquisitions net of license fees rather than on a gross basis; (iii) the Company's internal controls over financial reporting, and revenue recognition in particular, were ineffective; (iv) Digital Turbine did not perform proper due diligence into AdColony and Fyber; (v) consequently, it was extremely difficult to properly report revenue stemming from the AdColony and Fyber acquisitions; (vi) in view of the foregoing, the Company's net revenues were overstated during the 2022 fiscal year; and (vii) the Company failed to maintain internal controls.

64.     Because Defendants Stone, Deutschman, Chestnutt, Karish, Groos, Gyani, and Sterling caused the 2021 Proxy to be false and misleading, Company stockholders voted, *inter alia*, to: (1) reelect Defendants Stone, Deutschman, Chestnutt, Karish, Groos, Gyani, and Sterling to the Board, which allowed them to continue to breach their fiduciary duties to the Company and; (2) approve, via non-binding advisory vote, the compensation of the Company's named executive officers, including Defendants Stone and Garrison, who were breaching their fiduciary duties to the Company.

**August 9, 2021 Press Release**

65.     On August 9, 2021, Digital Turbine published its financial results for the first quarter of FY 2022 ended June 30, 2021, stating, in relevant part:

**Recent Financial Highlights:**

- **Fiscal first quarter of 2022 revenue totaled $212.6 million.** On a pro forma basis, as if both Fyber and AdColony were owned for the full quarter, total consolidated pro forma revenue for the fiscal first quarter of 2022 was $292.0 million, representing a 104% increase year-over-year as compared to the comparable pro forma figure for the fiscal first quarter of 2021.

*                    *                    *

**Fiscal 2022 First Quarter Financial Results**

Total revenue for the first quarter of fiscal 2022 was $212.6 million. Total "On-Device Media" revenue, which represents revenue derived from the Company's Application Media and Content Media platform products, increased 93% year-over-year to $120.3 million. **Total "In-App Media" revenue, which represents revenue derived from the AdColony and Fyber businesses beginning on the dates when the acquisitions closed during the quarter, was $92.3 million.** AdColony contributed $44.9 million during the quarter, while Fyber contributed $49.6 million during the quarter.

(Emphasis added.)

**August 9, 2021 Form 10-Q**

66.     The same day, Digital Turbine filed a Form 10-Q with the SEC for the quarter ended June 30, 2021 ("1Q2021 10-Q"). Defendant Stone and Defendant Garrison signed the 1Q2021 10-Q, which contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signifying the accuracy and truthfulness of the financial statement.

67.     The 1Q2021 10-Q reiterated the formerly reported financial results. Specifically, the 1Q2021 10-Q reported:

- Net revenues of $212,615, compared to $59,012 in 2020; and

- License fees and revenue share of $138,348, compared to $32,300 in 2020;

The 1Q2021 10-Q further explained the revenue disparities by referencing the new acquisitions:

Net revenues increased by 264.3% ($155,949) over the comparative periods due to a combination of continuing organic growth of the Company's historical legacy business (On Device Media) and contributions from recent acquisitions.

\*          \*          \*

Costs of revenues and operating expenses increased by 299.8% ($145,634) over the comparative periods, a result of continuing organic and inorganic growth, including the acquisitions of Appreciate, AdColony, and Fyber.

\*          \*          \*

License fees and revenue share increased by 328.3% ($106,048) over the comparative periods, attributable to the increase in net revenues over the same period as these costs are paid as a percentage of our revenues. License fees and revenue share increased at a greater rate over the comparative periods than the associated revenues to which they are tied due to our acquisitions having higher contractual revenue share percentages than the legacy business.

68.     The 1Q2021 10-Q stated that Digital Turbine's financial disclosure controls were effective: "[b]ased on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Report, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective."

69.     Moreover, the 1Q2021 10-Q maintained that Digital Turbine's revenue recognition policies did not change, even after the acquisitions of AdColony and Fyber: "there have been no significant changes to the Company's revenue recognition policies, now inclusive of the acquisitions of AdColony and Fyber . . . ."

**November 2, 2021 Press Release**

70.     On November 2, 2021, Digital Turbine, in a press release, published its financial results for the second quarter of FY 2022 ended September 30, 2021. The press release addressed the performance of the Company's recent acquisitions, in relevant part:

**Recent Financial Highlights:**

- Fiscal second quarter of 2022 revenue totaled $310.2 million, representing a 338% increase year-over-year on an as-reported basis and a 63% increase year-over-year as compared to the comparable pro forma figure for the fiscal second quarter of 2021.

                              *              *              *

Total revenue for the second quarter of fiscal 2022 was $310.2 million. Total "On-Device Media" revenue, which represents revenue derived from the Company's Application Media and Content Media platform products, increased 73% year-over-year to $129.4 million. Before intercompany eliminations, total "In-App Media" revenue, which represents revenue derived from the Fyber and AdColony businesses, increased 61% year-over-year on a pro forma basis to $187.2

million.  Fyber contributed $125.7 million during the quarter, while AdColony contributed $61.5 million during the quarter.

**November 2, 2021 Form 10-Q**

71.     On the same day, Digital Turbine filed a Form 10-Q with the SEC for the quarter ended September 30, 2021 ("2Q2021 10-Q"). Defendant Stone and Defendant Garrison signed the 2Q2021 10-Q, which contained certifications pursuant to SOX, signifying the accuracy and truthfulness of the financial statement.

72.     The 2Q2021 10-Q reiterated the formerly reported financial results. Specifically, the 2Q2021 10-Q reported:

- Net revenues of $310,205, compared to $70,893 in 2020; and

- License fees and revenue share of $213,145, compared to $40,532 in 2020

73.     The 2Q2021 10-Q further explained the revenue disparities by referencing the new acquisitions and their impact on revenue:

Over the three-month comparative periods, net revenues increased by 337.6% ($239,312), and over the six-month comparative periods, net revenues increased by 302.5% ($392,915). The changes are due to a combination of continuing organic growth of the Company's historical legacy business (now the On Device Media segment) and contributions from recent acquisitions.

\*               \*               \*

Over the three and six months ended September 30, 2021, total costs of revenues and operating expenses increased by $234,896 and $379,976, respectively, compared to the three and six months ended September 30, 2020. The increase in total costs of revenues was a result of continuing organic growth and the acquisitions of Appreciate, AdColony, and Fyber.

\*               \*               \*

License fees and revenue share increased by $172,613 to $213,145 in the three months ended September 30, 2021, and were 68.7% as a percentage of total net revenues compared to $40,532 or 57.2% of total net revenues in the three months ended September 30, 2020.

\*               \*               \*

The increase in license fees and revenue share was attributable to the increase in total net revenues over the same period as these costs are paid as a percentage of our revenues. The increase in license fees and revenue share as a percentage of total net revenues was primarily due to our recent acquisitions having higher license fees and revenue cost percentages, which is largely due to contractual revenue share percentages that are higher than the legacy business.

74.     The 2Q2021 10-Q stated that Digital Turbine's financial disclosure controls were effective: "[b]ased on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Report, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective."

75.     Moreover, the 2Q2021 10-Q maintained that Digital Turbine's revenue recognition policies did not change, even after the acquisitions of AdColony and Fyber: "there have been no significant changes to the Company's revenue recognition policies, now inclusive of the acquisitions of AdColony and Fyber . . . ."

**February 8, 2022 Press Release**

76.     On February 8, 2022, Digital Turbine, in a press release, published its financial results for the third quarter of FY 2022 ended December 31, 2021. The press release addressed the performance of the Company's recent acquisitions, in relevant part:

**Recent Financial Highlights:**

- Fiscal third quarter of 2022 revenue totaled $375.5 million, representing a 324% increase year-over-year on an as-reported basis and a 38% increase year-over-year as compared to the comparable pro forma figure for the fiscal third quarter of 2021.

*            *            *

Total revenue for the third quarter of fiscal 2022 was $375.5 million. Total "On-Device Media" revenue, which represents revenue derived from the Company's Application Media and Content Media platform products before intercompany eliminations, increased 43% year-over-year to $133.6 million. Before intercompany eliminations, total revenue from our two "In-App Media" segments, which represents revenue derived from the Fyber and AdColony businesses, increased 40% year-over-year on a pro forma basis to $251.7 million. Fyber

contributed $157.4 million during the quarter, while AdColony contributed $94.3 million during the quarter.

**February 8, 2022 10-Q**

77.     On the same day, Digital Turbine filed a Form 10-Q with the SEC for the quarter ended December 31, 2021 ("3Q2021 10-Q"). Defendant Stone and Defendant Garrison signed the 3Q2021 10-Q, which contained certifications pursuant to SOX, signifying the accuracy and truthfulness of the financial statement.

78.     The 3Q2021 10-Q reiterated the formerly reported financial results. Specifically, the 3Q2021 10-Q reported:

- Net revenues of $375,487, compared to $88,592 in 2020; and

- License fees and revenue share of $267,722, compared to $50,144 in 2020

79.     The 3Q2021 10-Q further explained the revenue disparities by referencing the new acquisitions and their impact on revenue:

Over the three-month comparative periods, net revenues increased by 323.8% ($286,894), and over the nine-month comparative periods, net revenues increased by 311.1% ($679,809). The changes are due to a combination of continuing organic growth of the Company's historical legacy business (now the On Device Media segment) and contributions from recent acquisitions.

*               *               *

License fees and revenue share increased by $217,578 to $267,722 in the three months ended December 31, 2021, and was 71.3% as a percentage of total net revenue compared to $50,144, or 56.6% of total net revenue, for the three months ended December 31, 2020.

*               *               *

The increase in license fees and revenue share was attributable to the increase in total net revenue over the same period as these costs are paid as a percentage of our revenue. The increase in license fees and revenue share as a percentage of total net revenue was primarily due to our recent acquisitions having higher license fees and contractual revenue cost percentages compared to the legacy business.

80.     The 3Q2021 10-Q stated that Digital Turbine's financial disclosure controls were effective: "[b]ased on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Report, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective."

81.     Moreover, the 3Q2021 10-Q maintained that Digital Turbine's revenue recognition policies did not change, even after the acquisitions of AdColony and Fyber: "there have been no significant changes to the Company's revenue recognition policies, now inclusive of the acquisitions of AdColony and Fyber . . . ."

82.     The aforementioned statements discussed in ¶¶ 51-66, 66-82 were false and misleading because they failed to disclose that: (i) AdColony and Fyber act as agents in certain of their product lines; (ii) resultingly, Digital Turbine was required to report revenues achieved by these acquisitions net of license fees rather than on a gross basis; (iii) the Company's internal controls over financial reporting, and revenue recognition in particular, were ineffective; (iv) Digital Turbine did not perform proper due diligence into AdColony and Fyber; (v) consequently, it was extremely difficult to properly report revenue stemming from the AdColony and Fyber acquisitions; (vi) in view of the foregoing, the Company's net revenues were overstated during fiscal year 2022; and (vii) the Company failed to maintain internal controls. Thus, Digital Turbine's public statements about its business and financial stature were materially false and misleading at all relevant times.

**THE TRUTH EMERGES**

83.     On May 17, 2022, the Company issued a press release announcing that Digital Turbine would "restate its financial statements for the interim periods ended June 30, 2021, September 30, 2021, and December 31, 2021, following a review of the presentation of revenue

net of license fees and revenue share for the Company's recently acquired businesses." The release

further commented on allocation of revenue in financial statements:

> The **revenue for certain product lines of the recently acquired businesses**, which are separate reportable segments, **will now be reported net of license fees and revenue share, rather than on a gross basis, as had been previously reported**. The changes have the offsetting effect of decreasing both revenue and license fees and revenue share in a like amount, while simultaneously increasing reported gross profit margin and Non-GAAP Adjusted EBITDA margin, in the interim financial statements for each relevant period.

(Emphasis added.)

84.     On the same day, Digital Turbine filed a Form 8-K with the SEC which confessed

that the "recently acquired businesses" were in fact AdColony and Fyber. The 8-K also forecasted

the impact restating the Company's financials would have on the Company's financial results:

> In connection with the integration of the Company's recently acquired businesses (AdColony Holding AS and Fyber N.V. (the "Acquired Companies")), management performed a review of the presentation of revenues and license fees and revenue share based on the accounting guidance for revenue recognition, including considerations of principal and agent (or "gross and net") presentation. **After a detailed review of the Acquired Companies product lines and related contracts with customers and publishers, the Company concluded that each Acquired Company acts as an agent in certain of their respective product lines and, as a result, the revenues for those product lines should be reported net of license fees and revenue share. Previously, all revenues of the Acquired Companies,** which are reported as separate segments referred to as In App Media – AdColony and In App Media – Fyber, respectively, **were reported on a gross basis.**
>
> *                *                *
>
> Previously, the Company's revenues were reported as approximately $212.6 million for the three-month period ended June 30, 2021, $310.2 million for the three-month period ended September 30, 2021, and $375.5 million for the three-month period ended December 31, 2021. **Based on its preliminary assessment, the Company expects that revenue on a net basis will be reported as approximately $158.1 million for the three-month period ended June 30, 2021, $188.6 million for the three-month period ended September 30, 2021, and $216.8 million for the three-month period ended December 31, 2021.**

(Emphasis added.)

85.     The 8-K conceded that Digital Turbine's "disclosure controls and procedures were not effective [during] June 30, 2021, September 30, 2021, and December 31, 2021."

86.     On this news, the Company's stock price fell $1.93 per share, or 7.1%, to close at $25.28 per share on May 18, 2022.

87.     Digital Turbine announced its fourth quarter and FY 2022 results shortly thereafter on May 18, 2022 in a press release. The revenue results were unremarkable:

> Digital Turbine, Inc. (Nasdaq: APPS) announced financial results for the fiscal full year and quarter ended March 31, 2022. The Company completed the acquisitions of AdColony Holdings AS ("AdColony") and Fyber N.V. ("Fyber") on April 29 and May 25, 2021, respectively. Specific references made to "pro forma" results in this release provide investors with quarterly results and comparisons as if all acquired businesses were owned for the entirety of fiscal years 2021 and 2022. The Company believes that pro forma results, where applicable, can provide investors with more relevant year-over-year comparisons. ***As was initially announced on May 11, 2022, the Company has restated its financial results for the fiscal year 2022 quarters to reflect revenue net of revenue share costs for certain product offerings of the acquired AdColony and Fyber businesses.*** Results discussed below reflect this change.
>
> *                    *                    *
>
> **Business Outlook**
>
> Based on information available as of May 31, 2022, the Company currently expects the following for the first quarter of fiscal 2023:
>
> - Revenue of between $183 million and $187 million
>
> - Non-GAAP adjusted EBITDA of between $49 million and $51 million
>
> - Non-GAPP adjusted EPS of $0.34 to $0.35, based on approximately 105 million diluted shares outstanding and an effective tax rate of 25% on Non-GAAP adjusted net income

(Emphasis added.)

88.     Fourth quarter 2022 revenue amounted to $184.1 million, falling significantly short of investor expectations. Analysts and investors anticipated revenues around $357.05 million.[1]

---

[1] William White, *APPS Stock Plummets 14% After Digital Turbine Earnings Miss Estimates*,

89.     Adjusted earnings per share also fell significantly short of analysts' expectations. Digital Turbine reported $0.39. Analysts anticipated $0.44.[2]

90.     On this news, the Company's stock price fell $5.75 per share, or 22.6%, to close at $19.68 per share on June 1, 2022.

## DAMAGES TO THE COMPANY

91.     As a direct and proximate result of the Individual Defendants' misconduct, Digital Turbine has been seriously harmed and will continue to be harmed. The Company will be subject to vast expenditures including, but not limited to: (i) legal fees and expenses incurred in connection with the Class Actions filed against Digital Turbine and two of the Individual Defendants; (ii) any funds paid to settle the Class Actions; (iii) costs incurred from the compensation and benefits paid to the Individual Defendants who have breached their fiduciary duties to Digital Turbine; and (iv) costs incurred from remedying the material weaknesses in Digital Turbine's financial reporting internal controls.

92.     Additionally, due to the Individual Defendants' actions, Digital Turbine's business, goodwill, and reputation with its industry partners, regulators, and stockholders have been gravely tarnished. For the foreseeable future, the Company will suffer from a "liar's discount" from the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

93.     By reason of their positions as officers and/or directors of the Company, each of the Individual Defendants owed and owe Digital Turbine and its stockholders fiduciary obligations

---

Investor Place, June 1, 2022, https://investorplace.com/2022/06/apps-stock-plummets-14-after-digital-turbine-earnings-miss-estimates/#:~:text=Digital%20%28NASDAQ%3A%20APPS%29%20stock%20is%20falling%20hard,that%20Wall%20Street%20was%20expecting%20for%20the%20quarter.
[2] *Id.*

of care, good faith, and loyalty, and were and are required to use their utmost ability to control and manage Digital Turbine in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of Digital Turbine's best interests and not in furtherance of their own personal interest or benefit. Each director and officer of the Company owes to Digital Turbine and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

94.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Digital Turbine, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. To discharge their duties, the officers and directors of Digital Turbine were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial behaviors of the Company. By virtue of such duties, the officers and directors of Digital Turbine were required to, among other things:

(a)     Conduct the affairs of the Company in an efficient, business-like manner in a fashion that complies with all state and federal laws, including Digital Turbine's own Code of Business and Ethical Conduct ("Code of Conduct");

(b)     Remain informed as to how Digital Turbine conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make disclosures as necessary to comply with applicable laws;

(c)     Keep accurate records and reports of the business and internal affairs of Digital Turbine and procedures for the reporting of the business and internal affairs to the

Board and to investigate periodically, or cause independent investigation to be made of, said reports and records;

(d)     Manage internal legal, financial, and management controls, such that Digital Turbine's operations comply with all applicable laws and Digital Turbine's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's stockholders would be accurate;

(e)     Ensure public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to publish are truthful and accurate; and

(f)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company and its stockholders.

## DERIVATIVE ALLEGATIONS

95.     Plaintiff brings this action derivatively for the benefit of Digital Turbine to redress injuries Digital Turbine suffered and will suffer as a direct result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Digital Turbine. Digital Turbine is named as a nominal defendant in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

96.     Plaintiff is, and has been at all relevant times, a stockholder of Digital Turbine. Plaintiff will adequately and fairly represent the interests of Digital Turbine in enforcing and prosecuting its rights.

## DEMAND IS EXCUSED AS FUTILE

97.     Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

98.     Digital Turbine's Board of Directors consist of Defendants Stone, Deutschman, Chestnutt, Karish, Groos, Gyani, and Sterling (collectively, the "Director-Defendants"), and non-party Mollie Spilman. Plaintiff did not make a demand on the Board to institute this action because such a demand would be futile. Plaintiff needs only to allege demand futility as to four of eight Director-Defendants that were on the Board at the time this action was filed.

99.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause or permit the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

100.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Digital Turbine to make materially false and misleading statements. Specifically, the Director-Defendants caused Digital Turbine to issue false and misleading financial statements which were intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, demand would be futile, and thus excused, as the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

101.    **Defendant Stone** - Defendant Stone has served as the Company's CEO since October 2014 and as a Company director since January 2015. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Stone with his principal occupation for which he receives substantial compensation. As CEO, Defendant Stone was ultimately responsible for all of the false and misleading statements and omissions that were made during the

Relevant Period, including the statements he personally made in numerous press releases during the Relevant Period and the statements in the 10-Qs, which he signed and signed SOX certifications. In addition, the 2021 Proxy was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board and shareholders approving, on an advisory basis, his unjust compensation. As the Company's highest officer and as a trusted director, Defendant Stone failed to oversee Digital Turbine's scheme to make false and misleading statements and consciously disregarded his duties to monitor internal controls over financial reporting. Moreover, Defendant Stone is a defendant in the Class Actions.

102.   Defendant Stone also engaged in insider trading while in possession of material non-public information, which is a violation of federal law. From his insider trading, Defendant Stone reaped profits in excess of $3.3 million during a period where Digital Turbine's stock price was artificially inflated because of the false and misleading statements outlined in this complaint. As a result, Defendant Stone breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Stone is futile and excused.

103.   **Defendant Deutschman** - Defendant Deutschman is currently the Chairman of the Board and has been since December 2014. Defendant Deutschman has served as a director since May 2013. Additionally, Defendant Deutschman serves as a member of the Audit Committee and the Governance and Nominating Committees. The 2021 Proxy was solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As the trusted Chairman of the Board, Defendant Deutschman failed to oversee Digital Turbine's scheme to make false and misleading statements and consciously disregarded his duties to monitor internal controls over financial reporting. As a result, Defendant Deutschman breached his

fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Deutschman is futile and excused.

104.    **Defendant Chestnutt** - Defendant Chestnutt is and has been a Company director since June 2018. He serves as a member of the Audit Committee. The 2021 Proxy was solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, Defendant Chestnutt failed to oversee Digital Turbine's scheme to make false and misleading statements and consciously disregarded his duties to monitor internal controls over financial reporting. As a result, Defendant Chestnutt breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon him is futile and excused.

105.    **Defendant Karish** – Defendant Karish is and has been a Company director since May 2013. He serves as the chair of the Compensation Committee. The 2021 Proxy was solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, Defendant Karish failed to oversee Digital Turbine's scheme to make false and misleading statements and consciously disregarded his duties to monitor internal controls over financial reporting. As a result, Defendant Karish breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon him is futile and excused.

106.    **Defendant Groos** - Defendant Groos is and has been a Company director since May 2021. She serves as the chair of the Audit Committee. The 2021 Proxy was solicited on her behalf and the false and misleading statements contained therein contributed to her reelection to the Board. As a trusted Company director, Defendant Groos failed to oversee Digital Turbine's scheme to make false and misleading statements and consciously disregarded her duties to monitor

internal controls over financial reporting. As a result, Defendant Groos breached her fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon her is futile and excused.

107.   **Defendant Gyani** - Defendant Gyani is and has been a Company director since January 2016. He serves as the chair of the Governance and Nominating Committee and as a member of the Compensation Committee. The 2021 Proxy was solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, Defendant Gyani failed to oversee Digital Turbine's scheme to make false and misleading statements and consciously disregarded his duties to monitor internal controls over financial reporting. As a result, Defendant Gyani breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon him is futile and excused.

108.   **Defendant Sterling** - Defendant Sterling is and has been a Company director since June 2019. She serves as a member of both the Compensation Committee and the Governance and Nominating Committee. The 2021 Proxy was solicited on her behalf and the false and misleading statements contained therein contributed to her reelection to the Board. As a trusted Company director, Defendant Sterling failed to oversee Digital Turbine's scheme to make false and misleading statements and consciously disregarded her duties to monitor internal controls over financial reporting. As a result, Defendant Sterling breached her fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon her is futile and excused.

109.   **Additional Allegations of Demand Futility as to Defendants Groos, Chestnutt, and Deutschman** – Defendants Groos, Chestnutt, and Deutschman (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they are responsible for the effectiveness of the Company's internal controls, the truth and

accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duties. In addition, the Audit Committee Defendants violated the Audit Committee Charter by failing to: oversee the integrity of the Company's financial disclosures adequately; oversee the Company's risk assessments and risk management adequately; discuss with management the Company's financial information prior to public distribution adequately; and oversee the Company's disclosure controls and procedures adequately. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

110. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to act with honesty and integrity; failed to provide the SEC and public with complete, fair, accurate, timely, and understandable disclosures; failed to comply with applicable laws and regulations; failed to act in good faith, responsibly with due care and diligence and without misrepresentation or omission of material facts; failed to promote ethical behavior at the Company; and failed to promptly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

111.    Digital Turbine has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Digital Turbine any part of the damages Digital Turbine suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

112.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

113.    The acts complained of herein constitute violations of fiduciary duties owed by Digital Turbine's officers and directors, and these acts are incapable of ratification.

114.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Director-Defendants for Violations of Section 14(a) of the Exchange Act

115.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

116.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

117.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

118.    Under the direction and watch of the Director-Defendants, the 2021 Proxy failed to disclose, *inter alia*: (i) AdColony and Fyber act as agents in certain of their product lines; (ii) resultingly, Digital Turbine was required to report revenues achieved by these acquisitions net of license fees rather than on a gross basis; (iii) the Company's internal controls over financial reporting, and revenue recognition in particular, were ineffective; (iv) Digital Turbine did not perform proper due diligence into AdColony and Fyber; (v) consequently, it was extremely difficult to properly report revenue stemming from the AdColony and Fyber acquisitions; (vi) in view of the foregoing, the Company's net revenues were overstated during the 2022 fiscal year; and (vii) the Company failed to maintain internal controls.  As a result of the foregoing, Digital Turbine's public statements about its business and financial stature were materially false and misleading at all relevant times. As a result, the 2021 Proxy was materially false and misleading.

119.    In the exercise of reasonable care, the Director-Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy, including but not limited to, the election of directors.

120.    The false and misleading elements of the 2021 Proxy led to, among other things, the reelection of Defendants Stone, Deutschman, Chestnutt, Karish, Groos, Gyani, and Sterling to the Board which allowed them to continue to breach their fiduciary duties to the Company. Additionally, the false and misleading statements in the 2021 Proxy led the stockholders, by non-binding advisory vote, to approve the compensation of Digital Turbine's executives, including Defendants Stone and Garrison, who were both in breach of their fiduciary duties to the Company.

121.    The Company was damaged as a result of the Director-Defendants' material misrepresentations and omissions in the 2021 Proxy.

122.    Plaintiff, on behalf of Digital Turbine, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

123.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

124.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Digital Turbine's business and affairs.

125.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

126.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Digital Turbine.

127.    In breach of their fiduciary duties owed to Digital Turbine, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and  misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (i) AdColony and Fyber act as agents in certain of their product lines; (ii) resultingly, Digital Turbine was required to report revenues achieved by these acquisitions net of license fees rather than on a gross basis; (iii) the Company's internal controls over financial reporting, and revenue recognition in particular, were ineffective; (iv) Digital Turbine did not perform proper due diligence into AdColony and Fyber; (v) consequently, it was extremely difficult to properly report revenue stemming from the AdColony and Fyber acquisitions; (vi) in view of the foregoing, the Company's net revenues were overstated during fiscal year 2022; and (vii) the Company failed to maintain internal controls. As a result of the foregoing, Digital Turbine's public statements about its business and financial stature were materially false and misleading at all relevant times.

128.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

129.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

130.    Additionally, during the Relevant Period, Defendant Stone profited from a large insider sale of Company common stock, receiving proceeds in excess of $3.3 million during a time

in which the Company's stock was artificially inflated due to the false and misleading statements issued by the Individual Defendants.

131.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

132.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

133.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Digital Turbine has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

134.    Plaintiff on behalf of Digital Turbine has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Digital Turbine, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Digital Turbine;

(c)    Determining and awarding to Digital Turbine the damages sustained by it

as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Digital Turbine and the Individual Defendants to take all necessary actions to reform and improve Digital Turbine's corporate governance and internal procedures to comply with applicable laws and to protect Digital Turbine and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

i.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the board;

ii.   a provision to permit the stockholders of Digital Turbine to nominate at least four candidates for election to the Board;

iii.   a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)   Awarding Digital Turbine restitution from Individual Defendants, and each of them;

(f)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)   Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: October 28, 2022

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Fax: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com


*Counsel for Plaintiff*